SAN ANTONIO SAVINGS ASSOCIATION AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
San Antonio Sav. Asso. v. Commissioner
Docket No. 47016-86.
United States Tax Court
T.C. Memo 1988-204; 1988 Tax Ct. Memo LEXIS 225; 55 T.C.M. (CCH) 813; T.C.M. (RIA) 88204; May 5, 1988; As amended May 6, 1988 *225 Petitioner, a regulated savings and loan institution, simultaneously sold and purchased loan participations in a three-cornered transaction with two other unrelated savings and loan institutions. Petitioner deducted the difference between the remaining principal balances of the participation interests sold and the amount of cash received in the transaction. On Petitioner's Motion for Summary Judgment, held, petitioner realized and may recognize losses on the transaction. Cottage Savings Assoc. v. Commissioner, 90 T.C.    (Mar. 14, 1988), and Federal National Mortgage Assoc. v. Commissioner, 90 T.C.    (Mar. 14, 1988), followed. Richard L. Bacon, Sarah J. Stitt, and Michael L. Pate, for the petitioner. Kendall C. Jones, Lawrence M. Hill, Nancy Romano, and Fera M. Wagner, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Petitioner has moved for summary judgment determining that it realized and may recognize a loss from the concurrent sale of 90 percent participation interests in some of its residential *227 first mortgage loans and purchase of 90 percent participation interests in different mortgage loans (the transaction). Three theories for disallowing the loss claimed have been advanced by respondent, as follows: First, the taxpayer merely swapped or exchanged mortgage loan participation interest packages that were materially or substantially the same, thereby precluding a realization event under section 1001. [1] Second, the statutory wash sale provisions of section 1091 preclude recognition of losses from the mortgage swap transactions because the exchanged properties constituted substantially identical securities. Third, even if the mortgage swap triggered a realization event under section 1001, and section 1091 does not apply, section 165 would preclude recognition of the losses claimed because the transaction lacked economic substance, serving no purpose other than to secure tax losses. Each of these arguments, according to respondent, inherently involves disputed questions of fact. During the pendency of Petitioner's Motion for *228 Summary Judgment, the Court filed its opinions in the cases of Cottage Savings Assoc. v. Commissioner (Cottage Savings), 90 T.C.    (Mar. 14, 1988), and Federal National Mortgage Assoc. v. Commissioner (FNMA), 90 T.C.    (Mar. 14, 1988). Subsequent to the opinions in Cottage Savings and FNMA, respondent has acknowledged that the mortgage exchange transactions in those cases and the transaction in this case were virtually identical. Respondent has also advised the Court that he is no longer arguing in this case that section 1091 applies, but that he continues to maintain the other positions set forth above. In the interest of expeditious resolution of this case, however, respondent has acknowledged that if this case were tried, or construing the facts most favorably for respondent for purposes of Petitioner's Motion for Summary Judgment, then the facts in this case would be essentially the same as those found by the Court in the Cottage Savings opinion. As in Cottage Savings and FNMA, the transaction in issue here was intended to comply with Memorandum R-49, a statement issued by the Federal Home Loan Bank Board, the agency that regulates the *229 thrift industry. Memorandum R-49 provided that concurrently "sold" and "purchased" loans need not be reported as losses for financial statement purposes if 10 criteria of similarity between the transferred and acquired loans were satisfied. On September 30, 1980, petitioner San Antonio Savings Association (SASA) transferred to Farm and Home Savings Association, Nevada, Missouri (Farm and Home), 90 percent participation interests in each of approximately 1,808 conventional first mortgage loans owned by SASA. The remaining principal balances on those loans aggregated $ 83,082,772, of which 90 percent was $ 74,774,495. On the same date SASA received from Farm and Home a wire transfer of cash in the amount of $ 59,817,597. All of the participation interests in the mortgage loans transferred were secured by residential properties located within the metropolitan area of San Antonio, Texas. Also on September 30, 1980, SASA acquired from Dallas Federal Savings and Loan Association of Dallas, Texas (Dallas Federal), 90 percent participation interests in each of approximately 1,834 conventional *230 first mortgage loans owned by Dallas Federal. On the same date, SASA transmitted, by means of a wire transfer, cash in the amount of $ 60,925,730 to Dallas Federal. Ninety percent of the remaining principal balances on the underlying mortgage loans was $ 74,802,167. All of the acquired participation interests were secured by residential properties located within the metropolitan area of Dallas, Texas. On November 15, 1980, the number of participation interests acquired by SASA from Dallas Federal was reduced, resulting in a refund of $ 1,046,905 paid by Dallas Federal to SASA; SASA's net payment for the participation interests it acquired was $ 59,878,825. Also on September 30, 1980, Farm and Home transferred to Dallas Federal 90 percent participation interests in conventional mortgages. The remaining principal balances on these mortgages and the cash payment from Dallas Federal to Farm and Home were approximately the same amounts as the principal balances and cash amounts involved in the transfers between SASA and Farm and Home, and SASA and Dallas Federal described above. [2]
*231 For its taxable year ended September 30, 1980, SASA deducted $ 14,956,898 as a loss from the Farm and Home transfer. The deduction claimed was equal to the difference between 90 percent of the remaining principal balances of the mortgage participation interests sold and the amount of cash received from Farm and Home. SASA transferred, without recourse, complete legal and beneficial ownership of the participation interests in the mortgage loans sold to Farm and Home. SASA has not reacquired any ownership interest in those mortgage loan participations. SASA acquired complete legal and beneficial ownership of the participation interests in the mortgage loans acquired from Dallas Federal, and SASA has not retransferred any ownership interests in those mortgage loans to any other person. Respondent contends that the sole purpose of the transaction among SASA, Farm and Home, and Dallas Federal was tax avoidance. Petitioner alleges that the transaction resulted in diversification of petitioner's loan portfolio, because the mortgage loans transferred by SASA to Farm and Home were secured by properties located in the San Antonio, Texas, area, while the mortgage loans acquired by *232 SASA from Dallas Federal were secured by properties located in the Dallas, Texas, area. Petitioner argues, however, that its motive for entering into the transaction is irrelevant. From the opinions of the Court in FNMA and Cottage Savings, it is apparent that the taxpayer's motive in entering into the mortgage exchange transactions is relevant but not conclusive. In FNMA, the taxpayer was a for profit, privately owned, corporation with close ties to the Federal Government, and the largest investor in home mortgages in the United States. FNMA provides liquidity for mortgage investments primarily by purchasing mortgages from lenders, using funds it acquires by issuing stock and debt securities. We found that FNMA conducted the transactions in issue for a number of reasons in addition to recognizing losses for tax purposes, summarizing those reasons as follows: Those reasons included: increasing its holdings of urban loans; expanding its customer base by developing relationships with savings and loan associations; increasing the portion of its portfolio with enforceable due-on-sale *233 clauses; and bolstering the secondary mortgage market by helping ailing savings and loan associations to diversify their portfolios and to recognize losses for tax purposes. [90 T.C. at    (slip opinion at p. 14).]
We rejected respondent's argument that the transactions "lacked economic substance and reality" and were not deductible. 90 T.C. at    (slip opinion at p. 33). In Cottage Savings, we stated of the transactions there in issue: The transfers were solely tax-motivated. That is, although participations often are sold for a variety of business reasons, in the instant case the loan participation sales and offsetting purchases were effectuated solely to reduce petitioner's tax liabilities (and, presumably, the tax liabilities of petitioner's trading partners). This, by itself, is not fatal to petitioner's claimed deduction in the context of the instant case (see, e.g., secs. 183(a) and 165(c)(2) for situations where this purpose might be conclusive), but it does require us to scrutinize the record with particular care. Joseph E. Widener, Trust No. 5 v. Commissioner,80 T.C. 304, 310 (1983). [Fn. refs. omitted; 90 T.C. at    (slip *234 opinion at pp. 25-27).] In both Cottage Savings and FNMA, we concluded that the exchanges in which the taxpayer participated resulted in closed and completed transactions within the meaning of section 165 and section 1.165-1(b), Income Tax Regs.FNMA, 90 T.C. at    (slip opinion at p. 33); Cottage Savings, 90 T.C. at    (slip opinion at pp. 45-46). Thus, although we examined the motives of the taxpayers, the decisive findings related to an actual transfer of the economic benefits from the loan participations. See Cottage Savings, 90 T.C. at    (slip opinion at pp. 19, 28); FNMA, 90 T.C. at    (slip opinion at pp. 12, 33). Normally a taxpayer's motive for entering into a transaction and the closed and completed nature of the transaction are questions of fact to be determined after trial. The correct amount of any claimed loss may also be disputed. See Cottage Savings, 90 T.C. at    (slip opinion at p. 27 n. 11). In this case, however, we may rely on respondent's acknowledgment to the effect that the facts in this *235 case are no more favorable to respondent's position than the facts found in Cottage Savings. We will therefore assume for purposes of petitioner's motion that the transaction entered into by SASA was motivated solely by tax considerations, that the transaction was closed and completed and changed the flow of economic benefits from the loan participations, and that the measurement of the loss is not separately disputed. The transaction will not be found to lack economic substance in these circumstances. As indicated above, respondent's primary challenge to petitioner's deduction of losses incurred in the loan exchange transaction is that petitioner did not realize a loss under section 1001 because the sale and simultaneous purchase of loan participation interests did not constitute "the exchange of property for other property differing materially either in kind or in extent." The quoted language appears in section 1.1001-1(a), Income Tax Regs.[3] Petitioner contends that, as a matter of law, the mortgage loan participation interests differed materially in kind or in extent because both the obligors and the underlying security of each loan were different. *236 Petitioner relies on Hanlin v. Commissioner,38 B.T.A. 811 (1938), affd. 108 F.2d 429 (3d Cir. 1939). In Cottage Savings, we described Hanlin and its applicability to the mortgage swap transactions as follows: In Hanlin we applied the wash sales provision, section 118 of the Revenue Act of 1932, [18] to three sets of transactions. We held that municipal bonds of the same obligor (Philadelphia) with insignificant differences in maturity dates were substantially identical *237 securities. 38 B.T.A. at 813-818. We held that Federal Land Bank bonds of the same obligor (Omaha Federal Land Bank) with insignificant differences in maturity dates were substantially identical securities. 38 B.T.A. at 818-819. However, we also held that bonds of the St. Louis and Wichita Federal Land Banks were not substantially identical to bonds of the Louisville Federal Land Bank. 38 B.T.A. at 819-820. We rested our decision on the difference in obligors and the difference in assets underlying the promises of the different obligors. The Circuit Court of Appeals for the Third Circuit affirmed our conclusions as to all three sets of securities except that, which regard to the St. Louis, Wichita, and Louisville Federal Land Banks, the Circuit Court of Appeals focussed more on the differing underlying securities than on the differing obligors. 108 F.2d at 431. In the instant case, the obligors are different and the underlying securities are different. The Hanlin standards lead us to conclude that the mortgage participations that petitioner acquired differ materially from the mortgage participations that petitioner *238 transferred. Respondent insists that the Hanlin criteria support his position in the instant case. He points out that the Circuit Court of Appeals in Hanlin focussed on the geographic differences between farmland near Wichita and farmland near Louisville, and directs our attention to the fact that "The geographical variations in risks of farm property which were critical to the decision in Hanlin are not present in this case, which involves residential real estate." Respondent overlooks the fact that Hanlin involved Federal Land Banks, each of which was at least secondarily liable on the debts of the others (108 F.2d at 431), while the instant case involves individual borrowers who apparently are each liable on only their own obligations. Respondent also overlooks the fact that, in Hanlin, each bond was secured by a mass of mortgages, so that only a regional disaster could affect the security of the bonds. Thus, in Hanlin, the courts focussed on regional differences. In the instant case, each obligation apparently is secured by one residential property, so that a misfortune affecting one family or one property could affect what happens to *239 that obligation without affecting any of the other obligations. We conclude that petitioner's position in the instant case is stronger than the position that the taxpayer in Hanlin took with respect to the bonds of the St. Louis, Wichita, and Louisville Federal Land Banks. In neither Cottage Savings nor FNMA did the Court hold that Hanlin controlled, but in each case we indicated that Hanlin supported petitioner's position. See FNMA, 90 T.C. at    (slip opinion at p. 31-32). In each case, we concluded that the properties exchanged were materially different, emphasizing that the loans had different obligors and were secured by different pieces of realty. [4] In Cottage Savings, we also noted the difference between ownership of mortgage loans and a 90 percent participation interest in such loans. 90 T.C. at    (slip opinion at pp. 28, 47). *240 In both Cottage Savings and FNMA we rejected respondent's arguments that the properties exchanged should be regarded as the packages of loan participation interests and treated as "mass assets" for purposes of comparison. Cottage Savings, 90 T.C. at    (slip opinion at pp. 38-41); FNMA, 90 T.C. at    (slip opinion at pp. 29-30). A contrary result was reached by the District Court in the case of Centennial Savings Bank FSB v. United States,    F. Supp.    (N.D. Tex., Jan. 22, 1988), upon determining that the parties looked to the totality of the loan packages rather than the individual loans in entering into their transactions. Although we have expressly disagreed with the analysis in Centennial Savings Bank FSB, Cottage Savings, 90 T.C. at    (slip opinion at pp. 46-48), that disagreement itself suggests a potential for factual dispute that in the ordinary case would preclude summary judgment. In view of respondent's acknowledgment that this case cannot be distinguished to respondent's advantage from Cottage Savings, however, Cottage Savings and FNMA compel the conclusion that the mortgage loan participation interests acquired *241 by petitioner from DallasFederal were materially different from the loan participation interests sold by petitioner to Farm and Home. For the foregoing reasons, the Court concludes that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Petitioner's Motion for Summary Judgment will be granted. Decision will be entered [Text Deleted By Court Emendation] under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect during the years in issue. ↩
2. The facts concerning the transfer between Farm and Home and Dallas Federal are set forth in an affidavit in support of respondent's opposition to petitioner's motion and are not disputed by petitioner. That aspect of the transaction is before the Court in Dallas Federal Savings and Loan Assoc., et al. v. Commissioner,↩ docket No. 42819-86. 3. We have decided petitioner's motion in accordance with the majority opinions in Cottage Savings Assoc. v. Commissioner, 90 T.C.    (Mar. 14, 1988), and in Federal National Mortgage Assoc. v. Commissioner, 90 T.C.    (Mar. 14, 1988). The author still holds the view expressed in a concurring opinion in Cottage Savings,↩ 90 T.C. at    (slip opinion at pp. 49-51), that there is no requirement applicable in this case that the properties exchanged differ materially in kind or in extent. Either view would lead to a decision for petitioner in this case. 18. In the instant case, respondent expressly concedes the inapplicability of sec. 1091, the successor to sec. 118 of the Revenue Act of 1932. [90 T.C. at   ↩ (slip opinion at pp. 36-38).]
4. [Cottage Savings] * * * exchanged participations in some loans for participations in other loans. Although the loans were similar, there were important differences. Specifically, the loans had different obligors and were secured by different pieces of realty. The subsequent history of payments on the loans * * * shows that the transactions were real, not feigned, and that the assets received were not the same as the assets given up. * * * [Cottage Savings, 90 T.C. at    (slip opinion at pp. 35-36).] * * *
The mortgages that [FNMA] received did not represent the same property rights as the mortgages that [FNMA] exchanged. As we found supra, the mortgages that [FNMA] received were obligations of different parties than the mortgages that [FNMA] exchanged. Additionally, the mortgages that [FNMA] received were collateralized by different properties than the mortgages that [FNMA] exchanged. We consider both of these differences to be material differences. The fact that the mortgages that [FNMA] received have experienced different rates of foreclosure, prepayment, and delinquency since the [Concurrent Mortgage Sales] transactions took place confirms that the mortgages [FNMA] received were "really different from what he theretofore had." [FNMA,↩ 90 T.C. at    (slip opinion at pp. 27-28).]